IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| GEM Industrial, Inc., | Case No. 3:08 CV 2991 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Sun Trust Bank, et al., | |
| Defendants. | |

Plaintiff GEM Industrial brings claims for breach of contract, promissory estoppel, and negligent misrepresentation against Defendants SunTrust Bank ("SunTrust"), Paladin Homeland Security Fund, LP, and Paladin Capital Group, LLC (collectively "Paladin"). GEM seeks $2.2 million in damages. All three Defendants filed Motions for Summary Judgment on all claims (Doc. Nos. 41-43). GEM filed Oppositions (Doc. Nos. 44-46) and Defendants filed Replies (Doc. Nos. 48-50). For the reasons stated below, this Court grants Defendants' Motions on all claims.

## BACKGROUND

To begin with a brief summary: GEM was the mechanical contractor for the construction of an ethanol production plant owned by GOE Lima, LLC ("GOE"). GOE fell behind on monthly payments to GEM and eventually requested a formal payment deferral. Before agreeing to the deferral, GEM asked to meet with representatives of the project's debt and equity investors -- SunTrust and Paladin -- to confirm sources of funding available to pay construction costs. GEM argues that, at those meetings, SunTrust and Paladin "promised and assured" GEM that it would be paid for its work on the plant. GEM was eventually paid by GOE for work performed before those

meetings, but GEM has not been paid for $2.2 million worth of work performed after those meetings. GOE is now in bankruptcy. Detailed facts follow.

### GEM's Work on the GOE Project

GOE was formed in 2005 for the purpose of constructing, owning, and operating an ethanol production plant in Lima, Ohio. GOE financed the project through both debt and equity capital. In November 2006, GOE entered into a $95 million credit agreement with a group of lenders, including SunTrust. SunTrust lent $23 million to the project and also served as the administrative agent for the lending group, representing the lenders in matters related to the ethanol plant project. Paladin was a major equity investor in the project, through GOE's parent company Greater Ohio Ethanol, LLC.

GEM was initially hired in August 2007 by GOE to serve as a millwright and boilermaker subcontractor for construction of the plant. GOE became dissatisfied with its mechanical contractor's performance and, in October 2007, GEM signed a contract with GOE ("GOE Contract") to serve as the prime mechanical contractor for the project. The GOE Contract included a clause allowing GEM to stop working if GEM did not receive financial information confirming GOE's ability to pay GEM for the work (PX 1, p. 20). GEM negotiated the GOE Contract exclusively with GOE; neither SunTrust nor Paladin was involved in negotiations (Heyman Dep., pp. 38-41). GEM did not seek a third-party guarantee for payments under the GOE Contract (Heyman Dep., p. 56).

Due to budget overruns and cash flow problems, GOE was late paying monthly invoices submitted by GEM, beginning in August 2007 (Stark Dep, pp. 74-77). The record is not entirely clear on the reason for GOE's budget problems, but they stemmed at least in part from delays and cost overruns caused by the first mechanical contractor that GEM had replaced.

Despite the payment delays, GEM continued to work on the plant. On March 31, 2008, GEM submitted to GOE a monthly invoice for approximately $2.5 million. Under the GOE Contract, payment on that invoice was due on April 21, 2008. GOE requested that GEM formally defer the payment for thirty days. On April 18, GEM's president Hussien Shousher met with GOE management to discuss the deferral request. During that meeting, Shousher inquired into GOE's sources of funding for project construction costs (Shousher Dep, pp. 93-96). GOE explained that in addition to the debt and equity financing already in place, there were two "extra" sources of funding available to pay construction costs, including a $10 million letter of credit and a potential $5 million loan from the State of Ohio. Paladin had provided the $10 million letter of credit in favor of SunTrust in February 2008 as "contingency equity" to cover unexpected overruns in construction costs. GOE had a pending application with the Ohio Department of Development for the $5 million loan.

**The April 28 Telephone Calls**

Following the April 18 conversation, Shousher requested meetings with representatives from SunTrust and Paladin to confirm GOE's representations about project funding (DX 2). GOE put GEM in touch with Yann Pirio of SunTrust and Ken Pentimonti of Paladin.

On April 28, 2008, Shousher, Doug Heyman (GEM's chief financial officer), and Bob Pruger (from GEM's parent company) placed a call to Pirio at SunTrust. The call lasted approximately thirty minutes. During the call, Pirio confirmed the existence of the letter of credit and the potential loan from the State of Ohio. According to GEM, Pirio told GEM that the $10 million letter of credit provided sufficient equity not only to pay GEM's pending invoices, but also to pay for GEM's future work through the completion of the project. Pirio told GEM that the estimated $100,000 per week in construction costs incurred by GEM going forward was not a "a needle mover" in the big picture

3

of the project (Pirio Dep, p. 164). Heyman believed that Pirio "promised and assured GEM's representatives, including me, that GEM would be paid in full for (i) the work GEM had installed at the Project at the time of (ii) the call, and the work GEM would perform at the Project following the phone call" (Heyman Aff., ¶ 5).

Later that same day, Shousher and Heyman called Pentimonti at Paladin. The parties discussed the mechanics of the $10 million letter of credit and other funding sources, including the pending State of Ohio loan application, operating capital, and local bank loans (Pentimonti Dep., pp. 88-90). According to Shousher's written email summary of the conversation (sent later that same day to other GEM managers), Pentimonti told GEM that "GEM is the primary vendor left" to be paid, and that Pentimonti expected the project's "liabilities in total to be significantly less than $10 million" (DX 10). Shousher also wrote that Pentimonti's message "was consistent with [the message of] GOE and SunTrust" (DX 10). According to Heyman, Pentimonti "promised and assured GEM's representatives, including me, that GEM would be paid in full for (i) the work GEM had installed at the Project at the time of the call, and (ii) the work GEM would perform at the Project following the phone call" (Heyman Aff., ¶ 12).

On May 1, 2008, Shousher sent an email to GOE agreeing to the thirty-day deferral of the outstanding March invoice, meaning that payment was now due on May 21 (DX 25). The deferral was conditioned on GEM receiving interest on the March invoice, and on GEM receiving payment for the April invoice on May 21 as well. The March and April invoices totaled nearly $4 million. Shousher concluded his email to GOE by saying "We appreciate the conference calls you have arranged with both SunTrust and Paladin Capital Group. Their representations have given us

4

sufficient comfort and visibility of upcoming payment forecast and sources" (DX 25). GEM continued to perform its mechanical work at the plant.

### Budget Problems Continue

GEM was not paid on May 21. The project continued to experience cash flow problems, stemming in part from the delayed start-up of ethanol production and the failure of the State of Ohio loan to close (Pentimonti Dep, pp. 123-26; Stark Dep., p. 102; PX Z). There was also a "credit agreement glitch" which impacted available funds (DX 28). GEM, concerned about the further delay, had brief conversations with Pirio on May 27 and Pentimonti on June 6. The substance of those conversations was similar to the conversations on April 28; the parties discussed funding sources for the GOE project, including the Paladin letter of credit and the pending State of Ohio loan (Shousher Dep, pp. 140-45, DX 5). Pentimonti also indicated on June 6 that Paladin would not back out of the project, and that "there is plenty of money there" (Shousher Dep, p. 145, DX 5). During this period, GEM never requested payment directly from SunTrust or Paladin.

In late June, GOE drew on the $10 million letter of credit to pay project costs. GEM's March and April invoices were finally paid out of these funds on June 26 and July 2, respectively. However, GEM was never paid for any work performed from May 2008 onward. On September 15, GEM's attorneys sent a payment demand letter to GOE, SunTrust, and Paladin. The letter noted that GEM had recorded a mechanic's lien for $2.1 million against the plant property. On October 3, GEM issued a "Stop Work Notice," halting its performance at the plant (DX 30). GOE filed for bankruptcy on October 15, 2008.

5

## STANDARD OF REVIEW

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## DISCUSSION

### CLAIMS AGAINST SUNTRUST

**Breach of Contract**

GEM claims that it entered into an oral contract with SunTrust as a result of the April 28 phone call with Pirio, or, alternatively, that GEM and SunTrust had an implied-in-fact contract. SunTrust breached the contract, GEM contends, by refusing to pay GEM for work performed at the ethanol plant. SunTrust disputes that it entered into an enforceable contract with GEM.

*Statute of Frauds*

This Court first addresses whether GEM's oral contract claim against SunTrust is barred by the Ohio statute of frauds. GEM's claim is based on SunTrust's alleged promise to pay GEM for amounts due for work under the GOE Contract. Such a promise to "answer for the debt . . . of

6

another" must be in writing. Ohio Rev. Code § 1335.05.[1] However, there are two exceptions to this rule: (1) when the new promisor agrees to become "primarily liable" on the debt, or (2) when the "promisor's leading object [is] to subserve his own business or pecuniary interest." *Wilson Floors Co. v. Sciota Park, Ltd.*, 54 Ohio St. 2d 451, 459 (1978) (citing *Crawford v. Edison*, 45 Ohio St. 239, paragraph one of syllabus (1887)). Here, GEM invokes the second of these exceptions -- the "leading object" doctrine (Doc. No. 1, ¶ 40) ("Suntrust's and Paladin's promises were made not to answer for GOE's debt but to protect and serve their own pecuniary interests and business purposes."). The existence of a "leading object" in an oral promise is generally a question of fact. *Trans-Gear, Inc. v. Lichtenberger*, 128 Ohio App. 3d 504, 510 (1998).

The Ohio Supreme Court explained the leading object exception in *Wilson Floors*, 54 Ohio St. 2d 451, where a subcontractor sued a bank lender to enforce an oral promise to pay the debts of a general contractor. *Id.* at 452. As construction lender for a development project, the defendant bank had made a number of mortgage loans to the general contractor, who fell behind on payments to the plaintiff subcontractor. *Id.* The late payments led to work stoppages, and the bank called two meetings with the project's subcontractors (including the plaintiff) to request detailed cost estimates for the work needed to complete the project. *Id.* at 452-53. Based on this information, the bank decided its interests were best served by providing additional financing to the general contractor and moving forward with the project. *Id.* at 452-53. The trial court found that at both meetings, a bank representative assured the plaintiff that if it returned to work, it would be paid. *Id.* The plaintiff

---

[1] "No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, default, or miscarriage of another person . . . unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized." Ohio Rev. Code § 1335.05.

7

returned and completed its work on the project, but its final invoice was never paid by the general contractor or the bank. *Id.* The court concluded the bank's promise to pay the general contractor's debts was not within the statute of frauds, because "the bank made its guarantee to [the plaintiff] to subserve its own business interest of reducing costs [on the project loans]." *Id.* at 460.

Assuming SunTrust made an enforceable oral promise to pay GEM (discussed below), the instant case is quite similar to *Wilson Floors*. Like the bank in *Wilson Floors*, SunTrust clearly had a pecuniary interest in seeing GEM complete its work at the ethanol plant. SunTrust had loaned $23 million to GOE, and ensuring completion of the project was the surest way to recoup its investment. SunTrust attempts to distinguish *Wilson Floors* in two principal ways, but neither is material to application of the "leading object" rule. First, SunTrust notes that the bank in *Wilson Floors* initiated the discussions with the subcontractors, while GEM initiated the conversation with SunTrust. Second, SunTrust did not make any additional loans to the project after talking with GEM, while the bank in *Wilson Floors* provided additional financing after meeting with the subcontractors. Neither of those facts was critical to the straightforward reasoning of *Wilson Floors*, where the only inquiry was whether the bank had its own business motivation in making the alleged promise. And neither of those facts changes the reality in this case that SunTrust had a $23 million loan on the line when it allegedly made its promise. That multi-million dollar loan was a significant investment, and a trier of fact could properly conclude that the "leading object" of SunTrust's alleged oral promise was its own pecuniary interest.

SunTrust relies heavily on an unpublished Ohio court of appeals case, *Mentor Lumber v. Victor*, No. 89-L-14-103, 1990 WL 237185 (Ohio App. Dec. 31, 1990). This Court does not find that case persuasive. In *Mentor Lumber*, a father allegedly made an oral promise to pay a debt owed to

8

a lumber company by his son's construction company. *Id.* at *1. The father had co-signed a number of loans to his son's company, and the trial court therefore found that the "leading object" of the father's promise was his significant financial stake in his son's company. *Id.* at *4. The appeals court decision cited by SunTrust reversed that finding, holding that the father's pecuniary interest was "too attenuated" from his promise to exempt it from the statute of frauds. *Id.* However, the court failed to explain its reasoning in any detail, and the unpublished decision appears to be in some tension with the straightforward rule set forth by the Ohio Supreme Court in *Wilson Floors*. This Court therefore declines to give any weight to *Mentor Lumber*.

In sum, assuming SunTrust made an oral promise to pay GEM, such promise does not fall within the statute of frauds, and SunTrust is not entitled to summary judgment on this ground. This Court will thus address the merits of GEM's contract claim against SunTrust.

*Oral Contract*

GEM claims a valid contract was formed between GEM and SunTrust when SunTrust's employee Pirio promised that GEM would be paid in full for past and future work at the ethanol plant, and GEM in fact completed its work at the facility. According to GEM, the promise was made during the phone conversation between Pirio and GEM's representatives (Shousher, Heyman, and Pruger) on April 28, 2008. SunTrust argues there is no evidence the parties agreed to the essential terms of a contract.

The existence of an oral contract, as with any contract, depends on mutual assent to the essential terms of the agreement. *Kostelnik v. Helper*, 96 Ohio St. 3d 1, 3-4 (2002). An enforceable contract must be "specific as to its essential terms, such as the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term." *Alligood v. Procter*

9

*& Gamble Co.*, 72 Ohio App. 3d 309, 311 (1991). "[I]f the parties' manifestations taken together as making up the contract, when reasonably interpreted in the light of all the circumstances, do not enable the court to determine what the agreement is and to enforce it without, in effect, 'making a contract for the parties,' no enforceable obligation results." *Litsinger Sign Co. v. American Sign Co.*, 11 Ohio St. 2d 1, 14 (1967).

Even construing the record in a light most favorable to GEM, the evidence is simply too vague to support the existence of an enforceable contract. The depositions and affidavits of GEM managers Shousher, Heyman, and Pruger state in very general terms that SunTrust promised to pay GEM for work performed at the job site. For example, Heyman testified (Heyman Aff., ¶ 5):

> During the phone call between GEM and SunTrust, Mr. Pirio promised and assured GEM's representatives, including me, that GEM would be paid in full for (i) the work GEM had installed at the Project at the time of the call, and (ii) the work GEM would perform at the Project following the phone call.

This testimony contains no suggestion that Pirio or anyone else at SunTrust explicitly agreed to essential contract terms such as price, duration, or timing of payments during the April 28 phone conversation; it merely asserts that SunTrust promised to pay GEM for work at the plant. The other testimonial evidence submitted by GEM is similarly vague as to any affirmative promises made by SunTrust during the April 28 call. Without more, such broad assertions are too indeterminate to support an enforceable contract.

GEM argues that essential terms such as price and timing can be supplied from the circumstances surrounding the phone conversation. In particular, GEM contends SunTrust's promise to pay implicitly incorporated the terms of GEM's contract with GOE. But even if the terms of the GOE Contract were controlling, this Court has no way of determining which party was responsible for paying GEM. Indeed, as evidenced by Shousher's deposition testimony, even GEM's

10

representatives did not know who was responsible for paying them under the new contracts allegedly formed on April 28 (Shousher Dep, pp. 272-73):

> Q: And what was going to pay the money? Was it going to get paid out of loan proceeds made to GOE, or was it going to be paid by somebody else?
> A: I'm not aware of the arrangement between SunTrust and GOE about how they were going to be compensated.
>
> Q: Under this agreement that you -- or contract that you say was created, you didn't have any idea who was actually going to pay it?
> A: I believe that would be between SunTrust, GOE, and Paladin.
>
> * * *
>
> Q: And, thus, you didn't know at that point?
> A: I didn't know at that point.

Thus, at the time the contract was allegedly created, the parties had not agreed on the fundamental question of who would pay GEM for its work. It is not even clear how many alleged contracts there were. Did GEM have three separate contracts with SunTrust, Paladin, and GOE, all with identical terms? Two contracts with SunTrust and Paladin, with GOE completely relieved of liability? One contract with all three parties, with each jointly liable for payment?

Such uncertainty about the identity of the parties to the contract and their relative obligations is fatal to GEM's contract claim. This is not a circumstance where this Court can supply minor terms of an otherwise enforceable contract. *See, e.g.*, *Alligood*, 72 Ohio App. 3d at 311 ("If it can be determined that the parties intend to be bound, a court may fashion *less essential* terms that were omitted[.]") (emphasis added). In sum, there is no evidence that anyone understood the basic terms of the alleged contract involving payment of millions of dollars.

11

*Implied-In-Fact Contract*

GEM also claims SunTrust breached an implied-in-fact contract to pay for GEM's work at the ethanol plant. The existence of an implied-in-fact contract, as with an express contract, "hinge[s] upon proof of all the elements of a contract." *Stepp v. Freeman*, 119 Ohio App. 3d 68, 74 (1992). The difference is that mutual assent to the essential elements of an implied-in-fact contract is shown not by an express offer and acceptance, but by the "surrounding circumstances, including the conduct and declarations of the parties[.]" *Id.* Those circumstances must "make it inferable that the contract exists as a matter of tacit understanding." *Id.*

GEM offers no evidence to support an implied-in-fact contract. To the contrary, the conduct of the parties points in the opposite direction. After the April 28 phone call with SunTrust, GEM continued to send invoices to GOE for its work at the ethanol plant. GOE made two payments on past due invoices to GEM on June 26, 2008 and July 3, 2008. GEM never sent any invoices to SunTrust or requested any payments from SunTrust until GEM's lawyers sent a demand letter to SunTrust on September 15, 2008. Thus, the conduct of the parties -- the touchstone of an implied-in-fact contract -- clearly indicates that GEM expected payments to come from GOE, not from SunTrust. Furthermore, GEM's implied-in-fact contract claim still suffers from the same basic difficulty as its express oral contract claim: the alleged contract (or contracts) does not clearly delegate responsibility for payment among SunTrust, Paladin, and GOE. None of the "surrounding circumstances" of the alleged agreement clear up that confusion; if anything, the circumstances indicate that GEM regarded GOE -- not SunTrust -- as the responsible party.

**Promissory Estoppel**

GEM also brings a claim against SunTrust for promissory estoppel. Under Ohio law, a promissory estoppel claim involves four elements: (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise was made; (3) the reliance was reasonable and foreseeable; and (4) the party relying on the promise was injured by its reliance. *Patrick v. Painesville Commercial Props.*, 123 Ohio App. 3d 575, 583 (1997). Here, there is no evidence supporting the first element of a clear and unambiguous promise. As explained above, even if GEM's evidence is accepted as true, it is not clear who was responsible for paying GEM under the GOE Contract. Therefore, SunTrust's alleged promise that GEM "would be paid in full" is not clear and unambiguous in its terms. *See, e.g.*, *Scotts v. Cent. Garden & Pet Co.*, 403 F.3d 781, 789 (6th Cir. 2005) ("[A] promise to abide by vague provisions . . . could neither be clear and unambiguous in its terms nor induce reasonable and foreseeable reliance[.]") (internal quotations omitted).

**Negligent Misrepresentation**

GEM also brings a claim against SunTrust for the tort of negligent misrepresentation. To be liable for negligent misrepresentation under Ohio law, a defendant must (1) in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, (2) supply false information (3) for the guidance of others in their business transactions (4) causing pecuniary loss to the plaintiff (5) while the plaintiff justifiably relied upon the information (6) and while the defendant failed to exercise reasonable care or competence in obtaining or communicating the information. *Delman v. City of Cleveland Heights*, 41 Ohio St. 3d 1, 4 (1989). The parties focus on the second and sixth elements -- false information and reasonable care.

13

*False Information*

The false information element requires a representation as to "past or existing facts, not promises or representations relating to future actions or conduct." *Telxon Corp. v. Smart Media of Del., Inc.*, No. 22098, 2005 WL 2292800, at *13 (Ohio App. Sept. 21, 2005). A tort claim for negligent misrepresentation is thus distinguished from a breach of contract claim, which is necessarily based on a promise of future conduct. *Id.* (citing *Cincinnati ex rel. Ritter v. Cincinnati Reds, LLC*, 150 Ohio App. 3d 728, 746 (2002)); *see also R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F. Supp. 1031, 1041 (N.D. Ohio 1996) ("A claim for negligent misrepresentation is based on false information, not a broken promise.").

The requirement of false information as to *past or existing facts* is born out by the specific circumstances of cases in which Ohio courts have recognized viable negligent misrepresentation claims. *See, e.g.*, *Haddon View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St. 2d 154, 156-57 (1982) (accounting firm could be liable to the members of a limited partnership for misrepresenting the partnership's current financial status); *Moffitt v. Auberle*, 167 Ohio App. 3d 120, 123-24 (2006) (doctor's office could be liable to a patient for misrepresenting that medical documentation had been sent to the patient's employer); *Martin v. Ohio State Univ. Found.*, 139 Ohio App. 3d 89, 104 (2000) (financial planner could be liable to retirees for misrepresenting timing of payments from a trust);[2]

---

[2]

At first blush, the misrepresentations at issue in *Martin* seem to relate to trust payments that had not yet occurred -- that is, the defendants were talking about something that would happen in the future. 139 Ohio App. 3d at 98-99. But the court clearly treated the defendants' misrepresentations about the trust as an inaccurate description of an existing financial product, rather than a promise of future payment. *See id.* ("These were not 'mere predictions' of future events. In all of the documents, [the defendant financial planners] were making the affirmative representation that if appellant went with their [financial product], he would receive payments beginning upon the formation of the trust in 1990."). Thus, *Martin*, like the other cited cases, based the defendants' liability on a false statement of *existing* fact.

14

*Lippy v. Soc'y Nat'l Bank*, 100 Ohio App. 3d 37, 45-46 (1995) (bank could be liable to a real estate investor for misrepresenting the qualifications and experience of an environmental assessment firm in connection with a real estate transaction the bank was financing); *Sindel v. Toledo Edison Co.*, 87 Ohio App. 3d 525, 531 (1993) (electric company could be liable to a grocer for misrepresenting the amount of electricity required to operate a particular building). Each of these cases involved a misrepresentation of concrete, specific, *existing* facts -- facts that were verifiable at the moment they were stated by the defendants.

In contrast, Ohio courts have denied negligent misrepresentation claims when the alleged misrepresentation relates to a promise of future action. *See, e.g.*, *Telxon*, 2005 WL 2292800, at *13 (refusing to allow a negligent misrepresentation claim when defendants failed to fulfill an alleged promise to invest a certain sum of money); *see also R.J. Wildner*, 913 F. Supp. at 1041 (refusing to allow a negligent misrepresentation claim under Ohio law when defendants failed to fulfill an alleged promise to pay for certain construction costs).

In this case, GEM's allegations of negligent misrepresentation focus on a promise of future conduct, rather than a false statement of existing fact. GEM's Complaint alleges "SunTrust . . . breached [its] duties to GEM by falsely representing to and assuring GEM that it would be paid in full for its Work at the Facility if GEM remained at the Facility and substantially completed its Work" (Doc. No. 1, ¶ 50). An assurance of future payment for future work is quintessentially a contractual promise. There is no allegation that SunTrust made a false statement of any specific, existing fact that would support a negligent misrepresentation claim. Thus, GEM's negligent misrepresentation claim, as pleaded, fails as a matter of law.

In its Opposition to Paladin's Motion for Summary Judgment, GEM recasts its negligent misrepresentation claim as one "based on SunTrust's representation that sufficient funding existed to pay GEM" (Doc. No. 46, p. 24). But this new formulation fares no better than the original. The alleged false statement about the project's financial status is still defined in terms of future conduct: funds existed out of which GEM *would be paid*. It does not relate to any specific, existing fact about the project's financing.

To be sure, when the record is construed in the light most favorable to GEM, SunTrust made several specific representations of existing fact to GEM -- namely, that there was a $10 million letter of credit available to pay project costs, that GOE had a loan application pending with the State of Ohio, and that GEM was the most significant contractor left to be paid. If those representations had been false, they might have supported a negligent misrepresentation claim. But GEM has pointed to no facts, and this Court has found none in the record, indicating that those representations were inaccurate. To the extent GEM argues those financial representations *implied* that GEM would be paid, such implication (even if unreasonable or negligent) relates to a *future* payment, not a presently existing fact. As it turned out, plant operations did not go smoothly, and the project experienced significant cash flow problems. But failure to predict a future event does not give rise to a negligent misrepresentation claim. In sum, GEM fails to satisfy the false information element of a negligent misrepresentation claim.

*Reasonable Care*

GEM cites *Moffit v. Auberle*, 167 Ohio App. 3d 120 (2006), for the rule that "whether an actor used reasonable care in acquiring or communicating information is a question for the jury, unless the facts are so clear as to permit only one conclusion." *Id.* at 123 (internal quotation omitted). GEM

16

claims there is a disputed issue of fact as to whether SunTrust used reasonable care in sharing information about the project funding with GEM. But, as explained above, there is no evidence of false statements of existing fact regarding project funding. The alleged negligent statements all related to whether GEM would be paid, and the reasonableness of those statements is irrelevant, because, as a matter of law, they do not support a claim for negligent misrepresentation.

### CLAIMS AGAINST PALADIN

GEM's claims against the two Paladin entities are materially identical to its claims against SunTrust; GEM alleges that Pentimonti of Paladin did and said essentially the same things as Pirio of SunTrust. Thus, the same analysis applies. As to GEM's contract claim, Paladin's alleged promises were no more detailed than SunTrust's alleged promises. Thus, the record could not support a finding of an enforceable contract between GEM and Paladin, because there was no meeting of minds as to the contract's essential terms. For the same reason, the record does not support a promissory estoppel claim against Paladin, because there was no clear and unambiguous promise. Finally, GEM's negligent misrepresentation claim fails because it has only claimed negligence relating to a future promise, rather than a present or existing fact.

Paladin Capital Group, LLC (apart from Paladin Homeland Security Fund, LP) has raised a separate, additional argument in support of its Motion for Summary Judgment. Paladin Capital Group claims that it never had any connection with the ethanol plant project; it is merely the non-managing member of the general partner of Paladin Homeland Security Fund, which was the actual investor in the ethanol plant (Pentimonti Aff., ¶¶ 4,6). Paladin Capital Group therefore argues it is not a proper party to this lawsuit. However, the record indicates that GEM understood Pentimonti to be acting on behalf of Paladin Capital Group. Shousher sent an email to GOE on May 1, 2008, thanking GOE for

17

arranging conference calls "with both SunTrust and Paladin Capital Group" (DX 25). Thus, there is a question of fact as to whether Pentimonti had apparent authority to bind Paladin Capital Group to the alleged contract. *See Church v. Fleishour Homes, Inc.*, 172 Ohio App. 3d 205, 219 (2007) ("Even when one assuming to act as agent for a party in the making of a contract has no actual authority to so act, such party will be bound by the contract if such party has by his words or conduct, reasonably interpreted, caused the other party to the contract to believe that the one assuming to as agent had the necessary authority to make the contract.") (internal quotation omitted). Nonetheless, as explained above, both Paladin Defendants are entitled to summary judgment on the merits of GEM's claims.

## CONCLUSION

GEM, a sophisticated contractor in business for many years, was confronted with a slow-pay project owner GOE. GEM had options under its written contract with GOE. The Court is not critical of GEM's decision to talk to the backers of GOE to try to receive assurances of future payments. However, the record does not change the critical fact that GEM's contract was with GOE, and GEM's conversations with Defendants Sun Trust and Paladin did not create legal liability on their part.

GEM chose to rely on oral assurances that there was sufficient funds for GEM to be paid, and GEM verified the availability of those funds. But, as often happens, circumstances change. With hindsight, a more prudent course would have been to demand guarantees "or else." Instead, GEM remained dependent on GOE for payment, and the risk remained with GEM -- not with SunTrust or Paladin.

18

Defendants' Motions for Summary Judgment are, for the reasons stated above, appropriately granted.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 31, 2010